**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

PRISONERS' LEGAL SERVICES OF NEW YORK, et al.,

Plaintiffs,

-against-

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

---------------------------------------------------------------X

25-CV-1965 (GHW) (VF)

**REPORT & RECOMMENDATION**

**VALERIE FIGUEREDO, United States Magistrate Judge.**
**To: THE HONORABLE GREGORY H. WOODS, United States District Judge.**

Plaintiffs Prisoners' Legal Services of New York, Robert F. Kennedy Human Rights, and the New York Civil Liberties Union commenced this action on March 10, 2025, against Defendants the U.S. Department of Homeland Security ("DHS"); U.S. Immigration and Customs Enforcement ("ICE"); Kristi Noem, in her official capacity as Secretary of DHS; Joseph E. Freden, in his official capacity as Deputy Field Office Director, Buffalo Federal Detention Facility; and Stephen Kurzdorfer, in his official capacity as Acting Buffalo Field Office Director for ICE Enforcement and Removal Operations.[1] The complaint alleges that Defendants are interfering with Plaintiffs' ability to communicate with their clients who are detained at the Buffalo Federal Detention Facility, by inspecting, copying, and retaining all legal mail arriving into and leaving from the facility, in violation of the First Amendment of the Constitution and the Administrative Procedure Act. ECF No. 1. On May 27, 2025, Plaintiffs filed the instant motion, seeking a preliminary injunction enjoining Defendants from enforcing their legal-mail policy.

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Stephen Kurzdorfer is automatically substituted for Thomas Brophy, who was named as a defendant in the complaint, but is the former Buffalo Field Office Director for ICE Enforcement and Removal Operations.

ECF No. 34. For the reasons set forth herein, I respectfully recommend that the motion for a preliminary injunction be **GRANTED** as modified herein.

## BACKGROUND[2]

### I. Factual Background[3]

Plaintiffs are three non-profit organizations, Prisoners' Legal Services of New York, Robert F. Kennedy Human Rights, and the New York Civil Liberties Union, that provide pro bono legal services to individuals detained at the Buffalo Federal Detention Facility ("BFDF"). ECF No. 1 at ¶¶ 1, 8-10. BFDF is an immigration-detention facility in Batavia, New York. ECF No. 46 at ¶ 5. DHS oversees the national immigration-detention system and ICE is the sub-agency of DHS that operates BFDF. ECF No. 1 at ¶¶ 11-12. Non-citizens charged with violating federal immigration law are detained at BFDF for immigration proceedings and removal from the United States. ECF No. 46 at ¶ 5.

A. The "ICE Standards" mail policy, in effect at BFDF before November 2023

BFDF, like all ICE-owned detention facilities, is subject to the 2011 ICE Performance-Based National Detention Standards with 2016 revisions (the "ICE Standards"). Id. at ¶ 7.

---

[2] The facts recounted herein are drawn from the complaint, as well as declarations filed by Plaintiffs and Defendants. See, e.g., Volokh v. James, 656 F. Supp. 3d 431, 436 (S.D.N.Y. 2023) (considering facts "from the complaint, [p]laintiffs' declaration in support of their motion for preliminary injunction, and [d]efendant's declaration in opposition to the motion, and the documents relied upon therein" in ruling on preliminary injunction); see also Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) (recognizing that "hearsay evidence" contained in declarations, for example, "may be considered by a district court in determining whether to grant a preliminary injunction"). Specifically, the Court has considered the declarations of W. Bradley Wendel (ECF No. 37), Jillian Nowak (ECF No. 38), Osvaldo Hodge Valdez (ECF No. 39), Anthony Enriquez (ECF No. 40), Tyler Jankauskas (ECF No. 41), and George P. Harvey Jr. (ECF No. 46), as well as the documents attached thereto.

[3] Page numbers referenced herein for citations to the electronic docket ("ECF") are to the ECF-generated pagination in those documents.

Chapter 5.1 of the ICE Standards contains provisions concerning the processing of incoming and outgoing special correspondence and legal mail to ensure that such correspondence "is treated as privileged mail." ECF No. 1 at ¶ 5; see also ECF No. 38 at ¶ 8; ECF No. 46 at ¶ 11. As is relevant here, special correspondence or legal mail is defined broadly to include any mail to or from private attorneys or other legal representatives, government attorneys, and judges and courts. ECF No. 41-3 at 340. Any mail to or from one of these persons or entities must be treated as special correspondence or legal mail as long as the "title and office of the sender (for incoming correspondence) or addressee (for outgoing correspondence) are unambiguously identified on the envelope, and the envelope is labeled 'special correspondence' or 'legal mail.'" Id.

Under the ICE Standards, all incoming correspondence must be delivered to a detained person within 24 hours of receipt by the facility, and outgoing correspondence must be delivered to the postal service no more than one day after receipt by the ICE facility. ECF No. 1 at ¶ 7 (citing ICE Standards § 5.1(V)(D) at 359); ECF No. 41-3 at 339. In the event that the status of an addressee or sender of special correspondence or legal mail must be verified for "exception[al] . . . security purposes," the ICE Standards limit the period of retention of such correspondence to 48 hours. ECF No. 1 at ¶ 8 (citing ICE Standards § 5.1(V)(D) at 359); ECF No. 41-3 at 339.

If a facility seeks to inspect correspondence for contraband, the ICE Standards state that the facility "shall implement procedures for inspecting for contraband, in the presence of the detainee, all special correspondence or legal mail." ECF No. 1 at ¶ 10 (citing ICE Standards § 5.1(V)(F) at 360); ECF No. 41-3 at 340. The ICE Standards require that the detained person sign a logbook upon receipt of special correspondence or legal mail "to verify that the special

correspondence or legal mail was opened in their presence." ECF No. 41-3 at 340. Even in the case of an inspection, "staff shall neither read nor copy special correspondence or legal mail." ECF No. 1 at ¶ 11 (citing ICE Standards § 5.1(V)(F) at 360); ECF No. 41-3 at 340. Additionally, as it pertains to outgoing special correspondence or legal mail, the ICE Standards bar such mail from being "opened, inspected or read." ECF No. 1 at ¶ 11 (citing ICE Standards § 5.1(V)(C) at 359); ECF No. 41-3 at 339.

With regards to documents given to a detainee during an in-person legal visit, the ICE Standards state that a detainee is "entitled to retain legal material received for their personal use." ECF No. 1 at ¶ 12 (citing ICE Standards § 5.1(V)(J) at 400); ECF No. 41-3 at 380. The ICE Standards further provide that the materials can be inspected but "shall . . . not [be] read." ECF No. 1 at ¶ 11 (citing ICE Standards § 5.1(V)(C)(5) at 359); ECF No. 41-3 at 339.

Prior to November 13, 2023, when legal mail was inspected at BFDF, an ICE officer brought a unit's legal mail to the unit, opened the legal mail in front of the recipient detainee, took any papers out of the envelope to check that there was nothing but paper inside the envelope, and then gave the envelope with its contents to the recipient. ECF No. 39 at ¶¶ 3-4. For in-person visits at BFDF, attorneys were able to bring legal documents directly to detained clients. Id. at ¶ 5.

B. BFDF's mail policy after November 2023

In November 2023, BFDF experienced "an emergency situation" involving drugs and synthetic substances being sent to detained individuals at the facility via the U.S. mail, including through delivery of mail marked both legal and non-legal. ECF No. 46 at ¶ 8. Through investigative means, officers at BFDF determined that detainees were receiving envelopes and papers in the mail that were soaked or sprayed with drugs or synthetic substances and disguised

as legal mail and non-legal mail. Id. Because the papers and envelopes were soaked or sprayed with liquids and disguised as both legal and non-legal mail, it was difficult for BFDF staff to detect the contraband while receiving and distributing the mail to detainees. Id. As a result, the contraband entered BFDF and came into a detainee's possession, and the detainee would smoke or ingest the soaked and sprayed paper, resulting in hospitalization. Id. Additionally, BFDF staff complained about the facility's air quality due to detainees smoking the illicit substances. Id.

On November 13, 2023, BFDF implemented a temporary policy pursuant to which all special correspondence, including legal mail, would be opened and photocopied in front of the detainee to whom the mail was addressed, and the original would be sealed in the original envelope and placed into the detainee's property bin (the "November 2023 Policy"). ECF No. 1 at ¶ 13; ECF No. 38 at ¶ 9; ECF No. 46 at ¶¶ 8-10; ECF Nos. 46-1, 46-2, 46-3. Once the original legal mail was placed in the detainee's property bin, the officer was required to "document the new seal number of the property bin and the detainee" would "sign off" indicating his "approval on the detainee's property sheet." ECF No. 46-3 at 1. ICE approved a 90-day waiver of the ICE Standards, which permitted BFDF to implement its November 2023 Policy. ECF No. 46 at ¶ 12; ECF No. 46-2.

The November 2023 Policy was intended to be a temporary measure, and it was not applied to outgoing legal mail. ECF No. 46 at ¶¶ 8, 10, 16; see also ECF No. 46-2 at 1 (noting that the "Buffalo Field Office only intends to take these emergent steps on a temporary 90-day basis" and was "working with vendors to find equipment that may be able to screen the mail" without having to photocopy it). After the November 2023 Policy was implemented, BFDF saw a reduction in drug-related incidents. ECF No. 46 at ¶ 17. On January 30, 2024, ICE approved an

additional 90-day waiver of the ICE Standards as it concerned the processing of legal mail at BFDF. Id. at ¶ 18.

According to the sworn declaration of Osvaldo Hodge Valdez, a detainee at BFDF (ECF No. 39), under the November 2023 Policy, ICE officers conducted inspections of legal mail by first calling an entire unit of detained individuals to the mail processing area. ECF No. 39 at ¶¶ 4, 8. The ICE officer opened the legal mail of each detained individual and showed it to the individual recipient. Id. at ¶¶ 8-9. The ICE officer then used a copy machine in the room to make a copy of the legal mail for the detainee. Id. at ¶ 10. The detainee received a copy of the legal mail and was asked to sign a logbook, confirming their receipt of a copy of their legal mail. Id. The ICE officer placed the original legal mail inside its original package and told the detainee that the original legal mail was placed in the detainee's individual property bin, although the detainee was not given access to it. Id. at ¶¶ 11-12. BFDF guidelines state that a detainee is "not allowed to access [their] personal property [in the property bin] after the time of initial admission until [they] leave the facility." ECF No. 41-4 at 3.

In the experience of Mr. Hodge Valdez, on only one occasion did an ICE officer close an original package with a piece of scotch tape and ask the detainee to initial the tape. ECF No. 39 at ¶ 11. In other instances where Mr. Hodge Valdez received legal mail, the inspecting ICE officer did not tape the original package or ask the detainee to initial the package. Id. Mr. Hodge Valdez asked an ICE officer to take him to his property bin to see his original legal mail placed there, but he was not "allowed to see [the officer] actually place the mail there." Id. at ¶ 12. On more than a dozen occasions, Mr. Hodge Valdez saw "ICE officers read the contents of someone's legal mail during their copying of that mail." Id. at ¶ 14; ECF No. 1 at ¶ 20.

With regards to outgoing legal mail, such "mail is collected by an ICE officer" from detainees "and taken away." ECF No. 39 at ¶ 7. Detainees do not receive confirmation that the legal mail has been sent out. Id. According to Mr. Hodge Valdez, detainees were never told whether their outgoing legal mail was opened and copied. Id. According to the sworn declaration of the Assistant Field Office Director at BFDF, George P. Harvey, Jr., the November 2023 Policy did not apply to outgoing legal mail, and "it has not been the general practice of the BFDF to open and copy outgoing legal mail." ECF No. 46 at ¶ 15.

C. BFDF's mail policy from March 2024 to November 2024

On January 30, 2024, BFDF received an additional 90-day waiver of the ICE Standards, to allow it to continue using the November 2023 Policy. See ECF No. 46-4 at 1; ECF No. 46 at ¶ 18. In February 2024, BFDF received an electronic scanning device that could detect liquids, powders, and laced papers, to scan for drugs and synthetic substances on paper. ECF No. 46 at ¶ 19. Beginning in March 2024, BFDF staff began transitioning to use of the mail scanner. Id. at ¶ 20. As Mr. Hodge Valdez recounts, around March 2024, ICE officers at BFDF paused the November 2023 Policy and "instead of copying and keeping" original legal mail, BFDF used the drug scanner. ECF No. 39 at ¶ 15. Because detainees "were allowed to keep the original[ ]" legal mail, ICE officers "did not have access to opened legal mail outside" of a detainee's presence. Id.

On May 13, 2024, ICE approved an indefinite waiver of the relevant ICE Standards to allow BFDF to open and photocopy all legal mail and special correspondence and place the original mail in the detainee's property bin. ECF No. 46 at ¶ 21; ECF No. 46-5. The memorandum in support of the waiver acknowledged that BFDF had an electronic scanning device that allowed for detection of foreign substances on paper, so long as the envelope contained fewer than 25 pages, but it also indicated that the device, although "a less intrusive

means to police the introduction of these dangerous materials," was "not 100% failsafe." ECF No. 46-5 at 2.

Also in May 2024, BFDF updated its policy to reflect that staff at the facility was "required to utilize the scanning device to scan legal mail and special correspondence to detect if it contained any foreign substance." ECF No. 46 at ¶ 22; see also ECF No. 46-6 at 2. The updated policy indicated that the legal mail could be scanned without being opened, so long as there were less than 25 pages in the envelope. ECF No. 46-6 at 2. It further indicated that, to the extent legal mail had to be opened and separated into smaller quantities for the scanner to work properly, the mail should be opened in the detainee's presence and the detainee would remove the pages from the original envelope and separate them into smaller quantities. ECF No. 46 at ¶ 22; ECF No. 46-6 at 2. If no foreign substance was detected, the mail would be "placed back into the original envelope" and given to the detainee. ECF No. 46-6 at 2. If a foreign substance was detected, the legal mail would be opened and copied in the detainee's presence, the original mail would be returned to the original envelope and placed in the detainee's property bin, and the detainee would receive a copy of the legal mail. ECF No. 46 at ¶ 22; ECF No. 46-6 at 3. The detainee would be present for the scanning, copying, and placement of the original mail in his property bin. ECF No. 46-6 at 3.

As it concerned documents received by a detainee during "legal contact visits," the policy indicated that such documents would be scanned using the electronic scanning device and the same procedures used for legal mail would be applied. ECF No. 46-6 at 3.

D. BFDF's mail policy after November 2024

After detecting another increase in incidents involving drugs and synthetic substances (ECF No. 46 at ¶ 23), on November 27, 2024, BFDF reinstituted the November 2023 Policy with

modification and stopped using the drug scanner for incoming legal mail and special correspondence. Id. at ¶ 24; ECF No. 46-7; ECF No. 1 at ¶ 27. This policy (the "November 2024 Policy") went into effect around December 2, 2024. ECF No. 46 at ¶ 24. Because ICE had already provided the necessary waiver in May 2024, BFDF was able to implement the November 2024 Policy on its own to "ensure a safe and secure detention environment." Id. at ¶¶ 7, 24.

As it concerned legal mail, BFDF reverted back to the November 2023 Policy, which required all legal mail and special correspondence to be inspected, opened, and photocopied in front of the detainee while in the mail processing unit. Id. at ¶ 24. "If photocopied, the detainee would be given the photocopy, and the original documents would be sealed in the original envelope and placed in the detainee's property bin." Id.

As it concerned documents received during a legal visit or a court appearance, the November 2024 Policy required such documents to be placed in a sealed envelope and given to the "contract officer" to be delivered to the mail processing unit, where it would be treated as special correspondence or legal mail. ECF No. 46-7 at 1; see also ECF No. 41-6 at 1. Special correspondence, including legal mail, is "inspected and opened and photocopied in front of the detainee in the" mail processing unit. ECF No. 46 at ¶ 24. If the legal mail is copied, the detainee is "given the photocopy," the original mail is "sealed in the original envelope and placed in the [detainee's] property bin," and the detainee "sign[s] off on a property sheet." Id.; ECF No. 46-7 at 1. The policy indicates that "at no time will an officer read any '[s]pecial [c]orrespondence' or '[l]egal [m]ail.'" ECF No. 46-7 at 1.

Plaintiffs did not come forth with an affidavit or declaration from a detainee that had experienced the November 2024 Policy firsthand. Instead, Mr. Hodge Valdez, who had "not yet experienced application of this broader policy," indicated based "on information and belief," that

for documents exchanged during in-person visits, the document is placed in an envelope and an officer "takes the envelope out of [the] visitation room to make copies." ECF No. 39 at ¶ 18. Detainees are not allowed to go with the officer "or see the officer opening and making copies of [the] legal documents." Id. The detainee is given a copy of the legal documents brought by the attorney and BFDF retains the original in the detainee's property bin. Id.

Plaintiffs submitted two declarations from attorneys who have experience with BFDF's present mail policies, because they have represented and continue to represent individuals detained at BFDF. ECF Nos. 38, 40. As Anthony Enriquez, an attorney from Robert F. Kennedy Human Rights recounts, "legal documents sent via mail are opened, copied, and originals retained by BFDF staff." ECF No. 40 at ¶ 6. Mr. Enriquez further attests that "[w]hether transmitted by legal mail, hand delivery, or facsimile, all legal documents sent by [the organization] to or from clients at BFDF are handled directly by BFDF officers or staff, outside of the presence of our detained clients." ECF No. 40 at ¶ 6. Jillian Nowak, an attorney from Prisoners' Legal Services of New York, explains that under the November 2024 Policy, "ICE officials make a copy of legal documents brought in-person, provide the copy to the detained individual, and retain the original." ECF No. 38 at ¶ 10.

In his sworn declaration, Assistant Field Office Director Harvey indicates that as of June 10, 2025, BFDF runs all legal mail and special correspondence, whether received through the U.S. mail or obtained during an in-person visit, through the drug scanner, and opens and copies all legal mail and special correspondence in front of the detainee, placing the original in the detainee's property bin. ECF No. 46 at ¶ 25.

## II. Procedural Background

On March 10, 2025, Plaintiffs commenced the instant action, alleging that the November 2024 Policy interferes with their provision of legal advice to clients detained at BFDF. ECF No. 1 at ¶¶ 32-38. Plaintiffs assert claims for violation of the First Amendment (id. at ¶¶ 39-42) and the Administrative Procedure Act (id. at ¶¶ 43-45). Plaintiffs seek declaratory and injunctive relief, as well as an award of attorney's fees, costs, and interest. Id. at Prayer for Relief.

On March 11, 2025, the Honorable Gregory H. Woods entered an order to show cause why the action should not be transferred to the Western District of New York. ECF No. 8. On April 4, 2025, Plaintiffs responded to the order to show cause, arguing that this District is an appropriate forum because Plaintiffs are located in this District. ECF No. 21. On April 6, 2025, Judge Woods indicated that he would "not take further action on the order to show cause," but would consider any motion to transfer brought by Defendants. ECF No. 25. Also on April 6, 2025, Judge Woods referred the action to the undersigned for general pretrial supervision and to report and recommend on dispositive motions. ECF No. 26.

On April 28, 2025, Defendants moved to transfer this action to the Western District of New York. ECF No. 30-31. The motion to transfer is pending before the Court. ECF Nos. 31-33.

On May 27, 2025, Plaintiffs filed the instant motion, seeking a preliminary injunction enjoining Defendants "from reading, copying, or retaining for more than 48 hours (including retention in a detained person's property bin) any incoming or outgoing confidential legal documents, including both legal documents transmitted by mail or in-person, to or from persons detained in the [BFDF]," during the pendency of this action. ECF No. 34; see also ECF Nos. 35-41. On June 10, 2025, Defendants filed their opposition brief to the motion for a preliminary injunction. ECF Nos. 45-46. On June 17, 2025, Plaintiffs filed their reply brief in further support

of their motion. ECF No. 47. On July 29, 2025, the Court held oral argument on the preliminary injunction motion.[4] ECF No. 58.

## LEGAL STANDARD

"Courts refer to preliminary injunctions as prohibitory or mandatory." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." Id. A movant seeking a preliminary injunction must show that: (1) there is a "likelihood of success on the merits" or that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation"; (2) that the movant is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of equities tips in [the movant's] favor"; and (4) that "an injunction is in the public interest." ZeptoLab UK Ltd. v. Commonwealth Toy & Novelty Co., No. 12-CV-2044 (TPG) (KNF), 2012 WL 4761501, at *5 (S.D.N.Y. Aug. 23, 2012) (internal quotation marks and citations omitted). Because mandatory injunctions disrupt the status quo, N. Am. Soccer League, LLC, 883 F.3d at 37, a party seeking one must make a "more demanding" showing of a "*clear or substantial* likelihood of success on the merits" and a "*strong showing* of irreparable harm." Daileader v. Certain Underwriters at Lloyds London Syndicate 1861, 96 F.4th 351, 356 (2d Cir. 2024) (emphasis in original).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). In determining whether to

[4] The Court had initially scheduled argument for July 1, 2025 (ECF No. 48) but rescheduled the argument at Defendants' request (ECF No. 49).

award a preliminary injunction, a court is entitled to rely on declarations, affidavits, and hearsay evidence. Mullins, 626 F.3d at 52.

## DISCUSSION

As an initial matter, Defendants ask the Court to address the pending motion to transfer the case to the Western District of New York before addressing Plaintiffs' motion for a preliminary injunction. ECF No. 45 at 12-13. Plaintiffs oppose this request. ECF No. 47 at 14. The parties do not dispute that this Court has jurisdiction to hear the preliminary injunction motion, and venue "is not a jurisdictional concept."[5] Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs, 307 F.2d 21, 29 (2d Cir. 1962). The Court may thus assess the merits of Plaintiffs' preliminary injunction motion before addressing Defendants' motion to transfer. See Hanover v. Zapata Corp., No. 72-CV-2025 (IBW), 1973 WL 376, at *1 (S.D.N.Y. Mar. 16, 1973) (addressing motion for a preliminary injunction before a motion to transfer per the Court of Appeals for the Second Circuit's direction that "the motion for a preliminary injunction be heard before transfer"); see also Hanly v. Powell Goldstein, L.L.P., 290 F. App'x 435, 438 n.2 (2d Cir. 2008)

[5] The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs raise a claim under the First Amendment. See NYC C.L.A.S.H., Inc. v. City of New York, 315 F. Supp. 2d 461, 470 (S.D.N.Y. 2004) (explaining that federal courts have jurisdiction over constitutional challenges to government actions). Further, the Court has jurisdiction to issue injunctive relief under 28 U.S.C. § 1361. See, e.g., Califano v. Yamasaki, 442 U.S. 682, 705 (1979) (noting that federal courts can use their "equitable power to issue injunctions in suits over which they have jurisdiction"). Even if venue would be preferable in the Western District of New York, venue is nonetheless appropriate here under 28 U.S.C. § 1391(e), because two of the Plaintiffs reside in this District (see ECF No. 1 at ¶¶ 9-10). See Chapman v. U.S. Dep't of Hous. & Urb. Dev., No. 25-CV-4765 (LTS), 2025 WL 1899811, at *1 (S.D.N.Y. June 13, 2025) (explaining that, if plaintiff resides in this District, and "[t]o the extent that [p]laintiff's claims [against a federal agency] do not involve real property," venue is proper under Section 1391(e)(1)(C)); see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432 (2d Cir. 2005) (explaining that venue may be appropriate in more than one district).

(addressing merits of motion to dismiss without addressing venue because "venue is not a jurisdictional issue" and thus "need not" be addressed "before turning to the merits").

Moreover, resolving the preliminary injunction motion first is particularly appropriate under the circumstances of this case. The motion for a preliminary injunction is fully briefed and ripe for review now. And Plaintiffs allege that the continued use of the November 2024 Policy is interfering with their ability to freely communicate with their clients in the course of providing legal representation, violating their First Amendment rights. Given the nature of the harm alleged, coupled with the inevitable delay that resolving the transfer motion will cause, addressing the preliminary injunction motion first is prudent. See Shirley v. Simms, 2022 WL 993893, at *2 (M.D. Tenn. Apr. 1, 2022) ("Due to the time-sensitive matters often raised in motions for preliminary injunctive relief . . . , the Court will . . . consider whether Plaintiff is entitled to immediate relief prior to transfer"); Nadhar v. Renaud, 2021 WL 2401398, at *1 n.1 (D. Ariz. June 11, 2021) (explaining that, "[g]iven the time constraints," the court would decide the motion for a preliminary injunction before the motion to dismiss); Erbsloeh Aluminum Sols., Inc. v. MueKo Mach., Inc., 2022 WL 4986608, at *1 (W.D. Mich. Aug. 11, 2022) (rejecting defendant's argument that the court should have resolved the motion to compel arbitration before granting preliminary injunction); see also Knaust v. City of Kingston, 157 F.3d 86, 89 (2d Cir. 1998) (explaining that district courts must decide motions for "preliminary injunctive relief promptly").

## I. Plaintiffs Are Entitled To An Injunction.

To obtain a preliminary injunction, a movant must show "first, irreparable injury, and second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party of

N.Y. State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004). Plaintiffs have made a substantial showing of a likelihood of success on the merits of their First Amendment claim and a strong showing of irreparable harm if the November 2024 Policy is not paused pending resolution of this case. They are thus entitled to a preliminary injunction.

A. Plaintiffs' First Amendment claim

*1. Likelihood of Success on the Merits*

Plaintiffs contend that the November 2024 Policy infringes their First Amendment right to communicate with their clients "by creating the unjustified risk that ICE officers may read or access" a detained individual's legal mail.[6] ECF No. 36 at 16. Defendants contend that courts have upheld policies like the November 2024 Policy, and in any event, Defendants claim that Plaintiffs have not put forth any specific allegation that a particular detainee's legal mail was read or mishandled. ECF No. 45 at 20-21.

Under the First Amendment, a detained individual has a "right to the free flow of incoming and outgoing mail." Antrobus v. City of New York, No. 11-CV-2524 (RA), 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014); see also Washington v. James, 782 F.2d 1134, 1138 (2d Cir. 1986) (explaining that as a corollary to a detained individual's right of access to the courts, "a prisoner has a right to correspond with his legal counsel"). It is well understood that a prison official may not open an inmate's properly marked legal mail outside of the inmate's presence.

[6] Although Defendants do not dispute Plaintiffs' standing to challenge the constitutionality of the November 2024 Policy, it is well settled that non-incarcerated individuals have standing to challenge detention center policies that infringe on First Amendment rights. See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision, 16 F.4th 67, 78-79 (2d Cir. 2021) (holding that church organization had standing to sue prison for prison's elimination of church program); see also Pen Am. Ctr., Inc. v. Trump, 448 F. Supp. 3d 309, 323 (S.D.N.Y. 2020) (holding that plaintiff had organizational standing to challenge actions infringing on the freedom of speech because both a sender and a recipient possess the right of free speech).

Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003); Amaker v. Lee, No. 13-CV-5292 (NSR), 2019 WL 1978612, at *14 (S.D.N.Y. May 3, 2019) (stating that "inmates have the right to be present when their legal mail is opened by prison officials"); Word v. Croce, 169 F. Supp. 2d 219, 228 (S.D.N.Y. 2001) (explaining that an inmate must be present when legal mail is opened). Although an "isolated incident of mail tampering is usually insufficient to establish a constitutional violation," prison officials violate the First Amendment when officers "regularly and unjustifiably interfere[ ] with incoming legal mail." Davis, 320 F.3d at 351-52 (affirming dismissal of inmate's constitutional claims where plaintiff "allege[d] neither the establishment of an ongoing practice by prison officials of interfering with his mail nor any harm suffered by him from the tampering" with his legal mail) (internal quotation marks and citations omitted). A prison official may open a prisoner's mail in their presence to inspect for contraband, but not to read the mail. Morgan v. Montanye, 516 F.2d 1367, 1372 (2d Cir. 1975) (citing Wolff v. McDonnell, 418 U.S. 539, 577 (1974)). This rule strikes a balance between enabling an inmate to trust that their legal communications will remain confidential and permitting prison officials to ensure the security of the facility. See Wolff, 418 U.S. at 577 (explaining that "a rule whereby the inmate is present when mail from attorneys is inspected" ensures that prison officials will not read the mail, thus safeguarding First Amendment rights while allowing the government to protect against contraband entering the facility).

Courts have repeatedly concluded that a legal-mail policy that creates a risk that a detainee's legal mail will be read could chill or interfere with a detainee's ability to speak openly with his attorney, thereby violating the First Amendment. See Christmas v. Nabors, 76 F.4th 1320, 1327-29 (11th Cir. 2023) (holding plaintiff stated a First Amendment claim where prison scanned the detainee's legal mail using a computer with a memory chip, because it could

reasonably be inferred from the use of a memory chip that the detainee's legal mail "*could*" be read outside detainee's presence) (emphasis in original); Thompson v. Ferguson, 2020 WL 7872629, at *9 (E.D. Pa. Dec. 31, 2020) (explaining that the "practice of keeping a copy of an inmate's privileged mail presents the same risk to confidentiality as opening the mail outside the inmate's presence: the risk that [prison] officials will read an inmate's legal mail, despite policies prohibiting such behavior"); Walker v. Little, 2022 WL 580641, at *8 (E.D. Pa. Feb. 24, 2022) (concluding that plaintiff plausibly alleged First Amendment violation where prison officials allegedly "photocopied [plaintiff's] legal mail and retained the original outside of his presence").

The November 2024 Policy challenged here creates a risk that BFDF staff will read a detainee's legal mail, whether received through the U.S. mail or during an in-person visit or court appearance. Under that policy, a detainee's original legal mail is kept by the facility in the detainee's property bin, after the detainee is given a photocopy of the document. ECF No. 46 at ¶¶ 24-25; ECF Nos. 46-6, 46-7. It is of no consequence that the property bins containing the legal mail are sealed, see ECF No. 46 at ¶ 25, or that BFDF officials lack access to the property bins, as argued by Defendants' counsel at the oral argument ECF No. 58 at 20. The mere act of BFDF staff retaining the original legal mail in a property bin outside of the detainee's control creates a sufficient risk of chilling the free flow of communication between a detainee and their attorney as to potentially violate the First Amendment. In Thompson, for example, the court found potentially problematic a legal-mail policy that permitted the prison to maintain a copy of the original legal mail, even where the original legal mail was placed in "a locked and secured receptacle" maintained by a third-party vendor (not the prison facility) and to which only the vendor had access. 2020 WL 7872629, at *3. Even though the original mail was destroyed by the vendor after 45 days and despite only the vendor having the ability to "unlock or access the

receptacle," id., the court nevertheless concluded that the plaintiff had plausibly alleged that the legal-mail policy violated his First Amendment rights because retaining the original legal mail outside of the inmates' presence "present[ed] a risk of chilling inmates' confidential, protected speech for fear that [prison officials] will read the contents of the original communication." Id. at *9.

That risk is even more amplified here. A detainee does not have access to their personal property in their property bin until they are released from BFDF. ECF No. 41-4 at 3. Additionally, as the declaration of Mr. Hodge Valdez explains, he has not been given an opportunity to see his legal mail placed in his property bin. ECF No. 39 at ¶ 12. Further, a detainee's original legal mail is retained indefinitely by BFDF in the property bins; unlike in Thompson, there is no requirement that the legal mail be destroyed after a certain period of time. Also in contrast to Thompson—where the legal mail was locked in a receptable for which only a third-party vendor had the key—the original legal mail here is kept by BFDF in property bins under the control of BFDF staff. See ECF No. 46 at ¶¶ 24-25.

Pointing to two cases, Defendants argue that policies like the November 2024 Policy have been upheld "in the face of similar First Amendment challenges" by federal courts. ECF No. 45 at 21-22. But the policies challenged in the cases Defendants cite differ from the November 2024 Policy in one important respect: in those cases, the original legal mail was destroyed after copies were made in the detainee's presence. See, e.g., Bray v. Mazza, 2022 WL 17836601, at *1 (W.D. Ky. Dec. 21, 2022) (upholding defendants' policy requiring "that all privileged mail, including blank or pre-paid envelopes, be photocopied" and "the inmate [be] provided the photocopy while the original is destroyed"); Levine v. Bradshaw, 2023 WL 11885182, at *1 (S.D. Fla. July 6, 2023) (upholding a policy where staff inspects inmates'

privileged mail for contraband in the presence of the inmate, and "in the inmate's presence, make[s] a photocopy of the original legal correspondence," and finally, after providing the photocopy to the inmate, "shred[s] the original documents while the inmate is present"); see also Strebe v. Kanode, 2018 WL 4473117, at *2 (W.D. Va. Sept. 18, 2018), aff'd, 783 F. App'x 285 (4th Cir. 2019) (upholding policy to photocopy incoming mail then shredding the "original envelope, letter, and all enclosed contents"). The Court is not aware of any case where a court upheld a legal-mail policy where the policy allowed the prison officials to retain a copy of the inmate's legal mail indefinitely.[7]

Defendants contend that the lack of "any specific allegations" by a detainee at BFDF that his mail was "read or otherwise mishandled" undermines Plaintiffs' showing of a likelihood of success on the merits. ECF No. 45 at 21. This argument fails for two reasons. First, as it concerns legal mail received through the U.S. mail, Mr. Hodge Valdez does attest, based on personal experience, that his original legal mail has been retained by BFDF in his property bin which he does not have access to while detained.[8] ECF No. 39 at ¶¶ 10-13. Plaintiffs have thus come forth with a specific instance of mishandling of legal mail received through the U.S. mail. Second, as

[7] And the retention of legal mail outside the presence of a detainee is only one troubling aspect of the November 2024 Policy. If BFDF staff copies legal documents outside of a detainee's presence, as Mr. Hodge Valdez claims has occurred (see ECF No. 39 at ¶ 18), that too would present an impermissible chilling effect on speech. See, e.g., Haze v. Harrison, 961 F.3d 654, 658 (4th Cir. 2020) ("Opening an incarcerated persons legal mail outside of his presence can chill protected speech."); cf. Wolff, 418 U.S. at 577 (concluding that legal-mail policy did not chill protected speech where it required such mail to be opened in the presence of the inmate, thus "insur[ing] that prison officials will not read the mail").

[8] To the extent Defendants fault Mr. Hodge Valdez's unsubstantiated statement that he has "seen ICE officers read the contents of someone's legal mail" on "over a dozen times" (ECF No. 39 at ¶ 14), the Court can conclude that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claim by focusing solely on BFDF's retention of legal mail outside of the control of a detainee where no contraband is found.

it concerns legal mail received during in-person visits or court appearances, the November 2024 Policy permits BFDF to retain the original legal mail even when no contraband is found. ECF No. 41-2. And in practice, the policy operates this way. Assistant Field Office Director Harvey confirmed that the facility is retaining the original legal mail in the property bin of detainees. ECF No. 46 at ¶ 25. Plaintiffs therefore do not need to come forth with a specific instance involving legal documents received through in-person visits or court appearances because Defendants do not dispute that BFDF is applying the policy and, on its face, the policy permits retention of the original legal mail.[9] In short, the evidence in the record demonstrates that the retention of legal mail in the property bins of detainees is not an isolated occurrence. See Davis,

[9] By contrast, although Plaintiffs claim that under the November 2024 Policy legal documents during in-person visits are taken by ICE Officers and inspected and copied outside of a detainee's presence, Mr. Hodge Valdez has not experienced this procedure personally. See ECF No. 39 at ¶ 18. Additionally, the attorney from Prisoners' Legal Services of New York speaks to this procedure under the November 2023 Policy, but not the current November 2024 Policy. See ECF No. 38 at ¶ 9. And the attorney from Robert F. Kennedy Human Rights speaks generally about legal documents being "handled directly by BFDF officers or staff," but does not expressly say that documents received during in-person legal visits are inspected and copied outside of a detainee's presence. ECF No. 40 at ¶ 6. Moreover, Assistant Field Office Director Harvey directly refutes that documents are inspected and copied outside of a detainee's presence, attesting that the documents are copied in the presence of a detainee and not read. ECF No. 46 at ¶ 25. The policy, as written, is consistent with Harvey's testimony. It provides for the copying of legal documents to be done in the detainee's presence and bars the reading of the document. See ECF Nos. 41-2, 41-6. Given the evidence in the record, there is a factual dispute concerning how the policy works in practice at BFDF, as it concerns legal documents received during in-person visits and court appearances. Ordinarily, "factual disputes necessitate[ ] an evidentiary hearing" before deciding a preliminary injunction. Kern v. Clark, 331 F.3d 9, 12 (2d Cir. 2003) (internal quotation marks and citations omitted). But because Plaintiffs have demonstrated a substantial likelihood of success on the merits of their First Amendment claim insofar as they have shown that Defendants retain original legal mail in a detainee's property bin, the Court need not resolve the factual dispute regarding whether documents exchanged during in-person visits are opened and copied outside of a detainee's presence. Sugarhill Recs. Ltd. v. Motown Rec. Corp., 570 F. Supp. 1217, 1222 (S.D.N.Y. 1983) (deciding a motion for a preliminary injunction without an evidentiary hearing because, despite factual disputes, the facts pertinent to the preliminary injunction were not in dispute).

320 F.3d at 351 (explaining that an "isolated incident of mail tampering is usually insufficient to establish a constitutional violation" but "regularly and unjustifiably interfer[ing] with incoming legal mail" violates the First Amendment).

As the court in Thompson explained, "the purpose of opening mail in an inmate's presence is to ensure that prison officials will not read the mail." 2020 WL 7872629, at *9. Permitting BFDF to keep a copy of a detainee's legal mail "presents the same risk to confidentiality as opening the mail outside the [detainee's] presence: the risk that [BFDF] officials will read an inmate's legal mail, despite policies prohibiting such behavior." Id. And as Mr. Hodge Valdez explains, because of the mail policy, he does "not trust that ICE officers will refrain from reading and accessing [his] confidential documents outside of [his] presence," and he thus has asked his lawyers to "no longer mail or bring [legal] documents" to BFDF and he has "also stopped sending legal mail to [his] lawyers." ECF No. 39 at ¶¶ 19-20. Simply stated, Plaintiffs have demonstrated that the November 2024 Policy impinges on their First Amendment rights by chilling their communications with clients detained at BFDF.

Nevertheless, because courts generally accord deference to the day-to-day judgments of prison officials, Turner v. Safley, 482 U.S. 78, 89 (1987), even if a prison's policy or practice impinges upon constitutional rights, it may nonetheless be valid "if it is reasonably related to legitimate penological interests." Id. To determine the "reasonableness of the regulation at issue," courts apply the so-called Turner factors: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) whether there will be an impact on guards and other inmates "and on the allocation of prison resources generally" if the proposed accommodation is implemented; and (4) whether

"obvious, easy alternatives may be evidence that the regulation is not reasonable." Id. at 89-90 (internal quotation marks and citations omitted); see also Johnson v. Goord, 445 F.3d 532, 535 (2d Cir. 2006) (applying the Turner factors to prisoners' challenge to facility's refusal to permit inmates from having more than one free stamp per month). Tellingly, Defendants do not address any of the Turner factors. See ECF No. 45 at 20-21.

The first Turner factor requires a court to "determine whether the governmental objective underlying the policy is (1) legitimate and (2) neutral, and (3) whether the policy is rationally related to that objective." Nicholas v. Miller, 109 F. Supp. 2d 152, 156 (S.D.N.Y. 2000) (internal quotation marks and citations omitted). According to Defendants, the November 2024 Policy was implemented in response to "an emergency situation regarding drugs and synthetic substances being sent to the detained population via the U.S. mail service, involving mail marked as legal mail and non-legal mail." ECF No. 46 at ¶ 8. In a sworn declaration, BFDF's Assistant Field Office Director Harvey, explains that implementation of the November 2024 Policy was necessary "to prevent drugs and other dangerous substances from entering the BFDF, as failing to do so could result in adverse health consequences to detainees and staff such as overdose or even death, and security concerns resulting from drug transactions among detainees." Id. at ¶ 25.

Defendants have produced evidence of prior drug-related incidents involving detainees at BFDF due to contraband entering the facility through legal mail. For example, in November 2023, BFDF "determined through investigative means that detainees were receiving envelopes and papers in the mail that were soaked or sprayed with drugs and/or synthetic substances and disguised as legal mail and non-legal mail." Id. at ¶ 8. "Because the papers and envelopes were soaked or sprayed with liquids and disguised as both legal and non-legal mail, it was difficult if not impossible for the BFDF to detect this contraband while receiving and distributing the mail

to detainees." Id. According to Assistant Field Office Director Harvey, who is responsible for the day-to-day operations at BFDF, "[d]etainees were . . . smoking or ingesting the soaked and sprayed paper within the BFDF, resulting in multiple health-related incidents such as suspected overdoses and detainees displaying an altered state." Id. Detainees had to be taken "to the hospital as a result of possible drug or substance use," and "[a]t least one detainee was administered Narcan due to a suspected overdose." Id. Further, detainees smoking or using drugs in the facility "affected the facility's air quality," leading to complaints from BFDF staff that the air quality in the facility "made them feel sick[ ] and created an unsafe work environment." Id.

Defendants also put forth evidence that contraband had entered BFDF through legal documents exchanged during court appearances. Specifically, in November 2024, BFDF "detected another increase in drug and synthetic substance related incidents within the facility." Id. at ¶ 23. As a result, staff again "complained about the air quality within the facility and how it gave them headaches and made them feel dizzy and nauseous." Id. At that time, BFDF investigated and "determined . . . that drugs or synthetic substances had entered the detained population through documents exchanged during court." Id. Preventing drugs and other illicit substances from entering a detention facility and ensuring the safety of both detainees and staff is unquestionably a legitimate government objective. See, e.g., Nicholas, 109 F. Supp. 2d at 156 (explaining that security "is surely a 'legitimate' consideration"); Bray, 2022 WL 17836601, at *4 (holding that the objective of "jail safety and security" was legitimate).

Further, the November 2024 Policy is neutral. To be neutral, "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." Thornburgh v. Abbott, 490 U.S. 401, 415-16 (1989) (internal quotation marks and citations omitted). The November 2024 Policy applies to all legal mail,

whether received via the U.S. mail, an in-person visit, or a court appearance, and the policy makes no distinction based on the contents of the communication in the legal mail. Also, the policy was implemented to stop illicit substances from entering BFDF, an important governmental interest unrelated to the contents of the communication.

Nevertheless, the November 2024 Policy is not rationally related to its objective of preventing drugs and other illicit substances from entering BFDF for two reasons. First, although Defendants have a valid governmental interest in inspecting legal mail, Defendants have not explained (nor is it apparent to the Court) why BFDF must retain copies of all legal mail, regardless of whether contraband is discovered, to further their legitimate interests of safety and security. See Johnson, 445 F.3d at 535 (explaining that, under Turner, a prison regulation must have a rational connection with "the legitimate governmental interest put forward to justify it") (internal quotation marks and citations omitted); Jones v. Brown, 461 F.3d 353, 360 (3d Cir. 2006) (explaining that although the "ultimate burden of persuasion with regard to the reasonableness of a regulation resides with those challenging it," prison administrators must "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and [that interest]") (internal quotation marks and citations omitted). Under the November 2024 Policy, BFDF retains a copy of all legal mail even where no contraband is discovered. See ECF No. 46 at ¶¶ 24-25. But there is no "obvious" or "common sense" connection between the retention of original legal mail where no contraband is detected and Defendants' interest in ensuring the safety of detainees and facility staff. Jones, 461 F.3d at 361. And Defendants have not proffered one either. See ECF No. 58 at 22. Even if the electronic scanner were not 100% effective at detecting illicit substances, a detainee receives a copy of his legal mail and consequently

Defendants could destroy the original legal mail without risking the introduction of illicit substances into the facility.

Second, the November 2024 Policy applies to legal mail regardless of whether it was received through the U.S. mail, an in-person legal visit, or a court appearance. ECF No. 46 at ¶¶ 24-25. But Defendants have offered no evidence that illicit substances were entering the facility through legal documents exchanged during in-person legal visits. Instead, Assistant Field Office Director Harvey states that BFDF's investigation in November 2024 revealed illicit substances entering "the detained population through documents exchanged during court." Id. at ¶ 23; see also id. at ¶ 8 (describing evidence of drugs entering through the mail). He makes no mention of an investigation revealing illicit substances entering the facility through documents provided by a legal representative during an in-person legal visit.

The retention of the original legal mail where no contraband is detected is overbroad. So too is application of the November 2024 Policy to documents provided by a legal representative during an in-person visit, given the lack of evidence of contraband entering the facility through that means of written communication. The November 2024 Policy thus does not "logically advance[ ] the goals of institutional security and safety." Turner, 482 U.S. at 93. It therefore appears to be "an exaggerated response to those objectives" and as such lacks a reasonable basis. Id.

The remaining Turner factors also weigh in favor of Plaintiffs. With regards to the second factor, Defendants make no argument that Plaintiffs have any viable alternative means to exercise their constitutional right to communicate with clients. Written communication between an attorney and client is core to the attorney-client relationship and the attorney's effective representation of the client, particularly where, as here, the client is detained, making

communication through other means, such as telephone or in-person visits, more complicated. See ECF No. 38 at ¶¶ 3-6; ECF No. 39 at ¶¶ 3-5; ECF No. 40 at ¶¶ 3-5. And Plaintiffs have set forth evidence demonstrating that the November 2024 Policy interferes with an attorney's ability to provide effective legal representation. For example, Ms. Nowak, an attorney with Prisoner's Legal Services of New York, explains in her sworn declaration that the November 2024 Policy interferes with the ability to communicate with clients detained at BFDF, because attorneys and clients "do not trust the privilege and confidentiality of attorney communications" will be maintained. ECF No. 38 at ¶¶ 9, 12. Further, "[c]lients have expressed . . . that they do not wish to have their legal or any other documents provided, neither by mail nor in person, . . . because of the risk that their communications may not remain confidential." Id. at ¶ 13; see also ECF 39 at ¶ 20 ("I fear that my legal mail could be read by ICE officers under BFDF's policy, and during the periods where ICE officers enforce this policy, I have asked that my lawyer no longer mail or bring documents to me at BFDF."). Additionally, because the November 2024 Policy applies to documents received by a detainee during an in-person visit, an in-person visit is no longer a viable alternative means of providing detainees with legal documents pertaining to their case.

Turning to the third and fourth factors, Defendants have put forth no argument that accommodating Plaintiffs' constitutional rights will have an impact on other inmates, guards, or the facility generally. There is also no evidence in the record to explain why retention of legal correspondence is necessary if contraband is not detected upon inspection of that mail. And, prior to November 2023, BFDF did not retain any original legal mail. ECF No. 1 at ¶ 11 (noting that even where legal mail was inspected, "staff shall neither read nor copy special correspondence or legal mail)" (citing ICE Standards § 5.1(V)(F) at 360); ECF No. 41-3 at 340. Defendants also do not argue that destroying the original legal mail would place a burden on prison resources. There

thus is at least one apparent alternative to the November 2024 Policy which would accommodate Plaintiffs' rights and impose no cost on BFDF's valid penological interests: where no contraband is detected, BFDF can copy the original legal mail in the detainee's presence, provide a copy to the detainee, and destroy the original legal mail.

All of the Turner factors weigh in favor of Plaintiffs. Plaintiffs have thus met their burden of demonstrating a substantial likelihood of success on the merits of their claim that the November 2024 Policy unconstitutionally abridges their First Amendment rights.

*2. Irreparable Harm*

Although typically "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction,'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)), in the First Amendment context, "likelihood of success on the merits is the dominant, if not the dispositive, factor." N.Y. Progress and Prot. PAC v. Walsh, 733 F.3d 483, 488 (2d Cir. 2013). Here, Plaintiffs have made a substantial showing of a likelihood of success on the merits of their First Amendment claim. See supra at 15-27.

Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 331 F.3d 342, 349 (2d Cir. 2003) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be *presumed*.") (emphasis added). And Plaintiffs do not rely on a presumption of irreparable harm here. Instead, Plaintiffs have come forth with evidence of an "actual and imminent" injury "that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd., 481 F.3d at 66 (internal quotation marks and citations omitted).

To that end, the November 2024 Policy interferes with Plaintiffs' ability to effectively represent and communicate with their clients. Written communication is essential to an attorney's competent representation of a client, because instances during the representation may require an attorney to communicate in writing "to ensure that critical details are not garbled or overlooked" or to ensure that the client has a written record to refer to when the advice is "detailed and complicated." ECF No. 37 at ¶¶ 16-17. Because of the November 2024 Policy, attorneys and clients alike do not trust that their legal documents and communications will remain confidential at BFDF. ECF No. 38 at ¶¶ 12-13. Plaintiffs' clients have thus expressed that "they do not wish to have their legal or any other documents provided" through the mail or in person, and attorneys fear that they cannot ethically provide privileged or confidential documents to clients because doing so "would invite document review and retention by ICE officers." Id.; see also ECF No. 37 at ¶¶ 10-14 (discussing the professional obligation of lawyers to protect client confidential information). These circumstances severely hinder an attorney's ability to "effectively use written legal documents to convey important representation-related communications to [their] detained clients at BFDF." ECF No. 40 at ¶ 7. What's more, the type of harm alleged here—the chilling of speech necessary for Plaintiffs to effectively represent their clients in legal proceedings (ECF No. 36 at 7)—cannot be remedied if the court were to wait until the end of a trial to resolve the harm, because those legal proceedings are ongoing and may be concluded well before a trial in this case even begins. See Ostrowski v. Loc. 1-2, Util. Workers Union of Am., AFL-CIO, 530 F. Supp. 208, 215 (S.D.N.Y. 1980) (noting that "a showing of a 'chilling effect' on plaintiffs' exercise of First Amendment rights is adequate to support [irreparable injury and thus] injunctive relief").

Defendants nevertheless argue that Plaintiffs' delay before seeking a preliminary injunction is a sufficient basis for the Court to deny the issuance of an injunction. ECF No. 45 at 15-18. Courts "generally consider delay in assessing irreparable harm." Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 39 (2d Cir. 1995). Delay or "[l]ack of diligence" may "preclude the granting of preliminary injunctive relief" because it "indicate[s] an absence of the kind of irreparable harm required to support a preliminary injunction." City of Newburgh v. Sarna, 690 F. Supp. 2d 136, 172 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) and Majorica, S.A. v. R.H. Macy & Co., Inc., 762 F.2d 7, 8 (2d Cir. 1985)). "[L]ength of delay is measured from the time the plaintiff originally learned of the alleged violation or is put on notice thereof, not when the irreparable injury allegedly begins." Two Hands IP LLC v. Two Hands Am., Inc., 563 F. Supp. 3d 290, 301 (S.D.N.Y. 2021) (internal citations omitted).

The first iteration of the November 2024 Policy was implemented in November 2023. ECF No. 46 at ¶¶ 8-16. Even from its implementation, however, the November 2023 Policy was intended to be a temporary measure. See ECF No. 46-2 (stating that BFDF "intends to take these emergent steps on a temporary 90-day basis, or until a more effective manner of screening the mail can be implemented" and noting that the facility was "working with vendors to find equipment that may be able to screen the mail . . . without having to photocopy the mail"). This perhaps explains why Plaintiffs did not immediately challenge the November 2023 Policy, because within 90 days or so, BFDF began using an electronic scanner and suspended use of the November 2023 Policy. See ECF No. 39 at ¶ 15; ECF No. 46 at ¶ 20.

In May 2024, BFDF issued a revised policy, which was in place until November 2024 and which Plaintiffs never challenged. ECF No. 46 at ¶¶ 21-22. That policy was in place for

approximately seven months, and it permitted the copying and retention of original legal mail, although only when contraband was detected in the document. See ECF No. 46-6 at 2-3. Although Plaintiffs' counsel at oral argument did not concede that copying and retention under such circumstances was permissible (ECF No. 58 at 6), Plaintiffs never brought a challenge to that policy. And that policy was instituted pursuant to a waiver of the ICE Standards for "an indefinite period," ECF No. 46 at ¶ 21, suggesting that the policy may not have been a temporary measure like the November 2023 Policy before it.

Regardless, a new policy was introduced on December 2, 2024 (id. at ¶ 24), when BFDF instituted the November 2024 Policy, which is challenged here. Plaintiffs then waited three months after the November 2024 Policy was implemented before filing the complaint on March 10, 2025. ECF No. 1. Plaintiffs did not file the instant motion for a preliminary injunction for another two and a half months, on May 27, 2025. ECF No. 34.

As it concerns the delay in filing the instant motion, courts have considered delays resulting from prioritizing other aspects of litigation to reasonably justify delays of up to a year between commencement of the case and the filing of the motion for a preliminary injunction. Bagley v. Yale Univ., 2014 WL 7370021, at *3 (D. Conn. Dec. 29, 2014) (finding that time spent on "contentious exchanges about discovery" did not amount to unexplained delay); see also In re Golden, No. 16-BR-40809 (ESS), 2025 WL 1349354, at *54-55 (Bankr. E.D.N.Y. May 7, 2025) (excusing delay in moving for a preliminary injunction based on delay caused by various discovery disputes and a motion to compel arbitration). According to Plaintiffs, the delay between March 2025 and the filing of the preliminary injunction motion was due to active settlement discussions, and Plaintiffs were also preparing a response to the order to show cause issued by Judge Woods. ECF No. 47 at 5, 7, 14. This delay is thus adequately explained.

See Goat Fashion Ltd. v. 1661, Inc., No. 19-CV-11045 (PAE), 2020 WL 5758917, at *5 (S.D.N.Y. Sept. 28, 2020) ("Acceptable explanations for delay include . . . diligent pursuit of settlement negotiations."); Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (noting that "diligent pursuit of settlement negotiations" could justify delay); Kraft Gen. Foods, Inc. v. Allied Old Eng., Inc., 831 F. Supp. 123, 136 n.12 (S.D.N.Y. 1993) (reasoning that "[plaintiff] should not be penalized for any delay [in moving for a preliminary injunction] arising out of settlement efforts").

The only unexplained delay then is the three months between the implementation of the November 2024 Policy and the filing of the complaint. "There is no bright-line rule for how much delay is too much, but courts in this Circuit 'typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'" Monowise Ltd. Corp. v. Ozy Media, Inc., No. 17-CV-8028 (JMF), 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (quoting Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)); Harrison v. Loc. One, Int'l Union of Elevator Constructors of New York & New Jersey, AFL-CIO, No. 24-CV-08619 (HG), 2025 WL 1013391, at *9-10 (E.D.N.Y. Apr. 5, 2025) (finding seven-month delay in commencing case and another two-and-a-half-month delay in moving for injunctive relief fatal to preliminary injunction motion); Council for Responsible Nutrition v. James, No. 24-CV-1881 (ALC), 2024 WL 1700036 (S.D.N.Y. Apr. 19, 2024) (finding five-month delay inexcusable). But the Court is not aware of any case, and Defendants have not pointed to any, where a three-month delay was fatal to a showing of irreparable harm, where a plaintiff also demonstrated a substantial likelihood of success on the merits of a First Amendment claim, as Plaintiffs have done here.

Defendants cite three cases that address delay in denying preliminary injunctive relief where the plaintiff asserted a potential First Amendment violation. See ECF No. 45 at 17-18. But those cases are distinguishable. In Council for Responsible Nutrition v. James, for example, the plaintiffs did not succeed in showing a likelihood of success on the merits of their First Amendment claim, and the court considered as much when assessing whether plaintiffs had suffered irreparable harm. Id., No. 24-CV-1881 (ALC), 2024 WL 1700036, at *9 (S.D.N.Y. Apr. 19, 2024) ("Because CRN has failed to demonstrate it will likely prevail in showing that the age restriction on dietary supplements has violated its First Amendment rights, it has likewise failed to establish an irreparable harm."). In Shady v. Tyson, the court ultimately determined that the single plaintiff, challenging an employment termination, had brought claims sounding in damages rather than equitable relief. Id., 5 F. Supp. 2d 102, 106-09 (E.D.N.Y. 1998) (considering delay in First Amendment case where the court concluded that the "lawsuit [wa]s, at its core, a single plaintiff's claim for money damages"). And in Million Youth March, Inc. v. Safir, although the court considered delay in the context of irreparable harm, it concluded that the case did "not present facts upon which plaintiff's delay alone warrants a conclusion that irreparable harm is unlikely, particularly in light of the constitutional nature of plaintiff's claim." Id., 18 F. Supp. 2d 334, 340 (S.D.N.Y. 1998).

So too here. Plaintiffs' three-month delay—which itself is on the cusp of what has been deemed excusable—by itself does not warrant a conclusion that irreparable harm is unlikely. To the contrary, as already discussed, Plaintiffs have come forth with evidence demonstrating that without an injunction they will be irreparably harmed. Plaintiffs have thus made a strong showing of irreparable harm and their three-month delay before filing suit does not undermine

the strength of that showing given their substantial likelihood of success on the merits of their First Amendment claim.

*3. Balance of Equities and Public Interest*

"[W]here a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." Deide v. Day, 676 F. Supp. 3d 196, 232-33 (S.D.N.Y. 2023); see also Averhart v. Annucci, No. 21-CV-383 (NSR), 2021 WL 2383556, at *16 (S.D.N.Y. June 10, 2021) (holding that "the risk of substantial constitutional harm to [p]laintiff . . . outweigh any administrative hardships that [d]efendants might experience" from injunction enjoining agency action). Additionally, courts in this Circuit have recognized that "securing First Amendment rights is in the public interest." 725 Eatery Corp. v. City of N.Y., 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019) (internal quotation marks omitted) (quoting N.Y. Progress and Protection PAC, 733 F.3d at 488); Ligon v. City of N.Y., 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.").

Defendants raise no arguments that the balance of equities tips in favor of denying a preliminary injunction. Nor could they. Plaintiffs allege violations of the First Amendment and thus the balance of hardships tips decidedly in their favor. See Averhart, 2021 WL 2383556, at *16.

B. Plaintiffs' Administrative Procedure Act claim

Plaintiffs additionally argue that the November 2024 Policy violates the Administrative Procedures Act (the "APA") for two reasons: the policy "fail[s] to abide by the ICE Standards" and the policy violates the First Amendment. ECF No. 36 at 26-27. "The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law,' . . . which means, of

course, *any* law, and not merely those laws that the agency itself is charged with administering." F.C.C. v. NextWave Pers. Commc'ns Inc., 537 U.S. 293, 300 (2003) (emphasis in original) (quoting 5 U.S.C. § 706(2)(A)). This includes agency actions that "fail[ ] to meet . . . constitutional requirements." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971), abrogated on other grounds by, Califano v. Sanders, 430 U.S. 99 (1977).

Case law makes clear that where, as here, there is a substantial likelihood that agency action is "not in accordance with the law" and "contrary to constitutional right, power, privilege, or immunity," a plaintiff has shown a likelihood of success on the merits of an APA claim. Widakuswara v. Lake, 773 F. Supp. 3d 46, 56-57 (S.D.N.Y. 2025) (granting a temporary restraining order because plaintiffs demonstrated a likelihood of success on the merits of their APA claim, as the challenged action likely violated two constitutional provisions) (internal quotation marks omitted) (quoting 5 U.S.C. §§ 706(A), (B)); Am. Council of Learned Soc'ys v. McDonald, No. 25-CV-3657 (CM) (BCM), 2025 WL 2097738, at *39 (S.D.N.Y. July 25, 2025) ("The [c]ourt has concluded that [p]laintiffs are entitled to preliminary injunctive relief solely because they are likely to succeed on the merits of demonstrating that the [agency action] was carried out in violation of the First Amendment[, and thus was] a violation of the APA that must be held unlawful and set aside as contrary to constitutional right."); see also New York v. U.S. Dep't of Homeland Sec., 969 F.3d 42, 64-80 (2d Cir. 2020) (analyzing whether agency action violated the APA based on whether it was contrary to a federal statute). Therefore, Plaintiffs have established a likelihood of success of the merits of their APA claim, given their substantial showing of a likelihood of success on the merits of their First Amendment claim.

## II. Plaintiffs Seek A Mandatory Injunction.

Plaintiffs request that the Court preliminarily enjoin Defendants from enforcing the November 2024 Policy, and any other policy, practice, or custom that allows for the reading, copying, and retention of confidential legal mail provided by mail or in person, to or from Plaintiffs, other organizations providing legal services, courts, and clients and potential clients detained in BFDF. ECF No. 36 at 30. As counsel indicated at the oral argument, Plaintiffs seek a return to the ICE Standards, which were last in place at BFDF prior to November 2023. ECF No. 36 at 8-9; ECF No. 58 at 35-36, 38. Defendants argue that this is a mandatory injunction, because Plaintiffs seek to stop Defendants from following a policy that has become the status quo due to it having been in effect for "the better part of eighteen months." ECF No. 45 at 14-15. Defendants are correct that Plaintiffs seek a mandatory injunction.

"The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." Tom Doherty Assocs., Inc., 60 F.3d at 34; see also N. Am. Soccer League, LLC, 883 F.3d at 36 ("Prohibitory injunctions maintain the status quo pending resolution of the case."). A prohibitory injunction "'forbids or restrains an act.'" Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (quoting Black's Law Dictionary 788 (7th Ed. 1999)). By contrast, a mandatory injunction alters the status quo. N. Am. Soccer League, LLC, 883 F.3d at 36. "[A] mandatory injunction orders an affirmative act or mandates a specified course of conduct." E.F. v. Adams, No. 21-CV-11150 (ALC), 2022 WL 601999, at *8 (S.D.N.Y. Mar. 1, 2022) (internal quotation marks and citations omitted); Students for Fair Admissions v. U.S. Mil. Acad. at W. Point, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (explaining that a "mandatory injunction," alters "the status quo by commanding some positive act") (internal quotation marks and citations omitted).

For a preliminary injunction motion, the status quo "is the last actual, peaceable uncontested status which preceded the pending controversy." LaRouche v. Kezer, 20 F.3d 68, 74 n.7 (2d Cir. 1994); see also Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 274 (S.D.N.Y.), aff'd, 788 F. App'x 85 (2d Cir. 2019) (defining "status quo"). For example, where the preliminary injunction sought would require the reversion to a practice immediately preceding the conduct the movant seeks to enjoin, the injunction is prohibitory and aimed at preserving the status quo. See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt., No. 25-CV-1237 (DLC), -- F. Supp. 3d --, 2025 WL 1621714, at *24 (S.D.N.Y. June 9, 2025) (determining that injunction that sought a return to compliance with the Privacy Act after Department of Government Efficiency agents were granted "sweeping access to" plaintiffs' personally identifiable information was a prohibitory injunction because the injunction would "return to the status quo as it existed before"); Whipper v. Green, 2024 WL 3771786, at *11 (D. Conn. Aug. 13, 2024) (explaining that plaintiff sought a return to the status quo when "he [sought] no more than a return to his original position, before the events that prompted this litigation"); Joshi v. Trs. of Columbia Univ. in City of N.Y., No. 17-CV-4112 (JGK), 2020 WL 5125435, at *4 n.1 (S.D.N.Y. Aug. 31, 2020) (explaining that injunction seeking reopening of a recently closed university lab was a prohibitory injunction because it would preserve the status quo).

Plaintiffs contend that they do not seek a mandatory injunction because they seek to restore the ICE Standards. ECF No. 47 at 6. But the ICE Standards have not been in place at BFDF since November 2023. In the interim 20 months, BFDF instituted various mail policies, none of which Plaintiffs challenged, including, most recently, the use of an electronic scanning device, in a policy that was in effect from May 2024 through November 2024. See supra at 4-10.

The last uncontested status was the policy in place from at least May 2024 through November 2024, under which legal mail received through the U.S. mail, but not documents exchanged in person, were inspected using the electronic scanner, and copies of the original legal mail were retained only if contraband was found. ECF No. 46-5; ECF No. 39 at ¶ 15; ECF No. 46 at ¶¶ 21-22. The status quo, in terms of the parties' relationships vis-à-vis each other, is where Plaintiffs could communicate with their clients in Defendants' custody without the substantial risk of legal mail being read. N. Am. Soccer League, LLC., 883 F.3d at 37 (explaining that status quo "is the parties' pre-controversy position vis-à-vis the other," and that an injunction that would alter the parties' relationship would alter the status quo). That last occurred between May and November 2024, when BFDF was not copying and retaining legal mail unless contraband was found. If Plaintiffs had sought a return to that policy, they would be seeking a prohibitory injunction. Their request for a return to the ICE Standards, however, is a request for a mandatory injunction. See Students for Fair Admissions, 709 F. Supp. 3d at 130 (determining that sought preliminary injunction was mandatory because the requested relief would revert to a policy that had not been in place for decades).

As indicated at oral argument, Plaintiffs do not want a return to the policy in place between May and November 2024, because Plaintiffs contend that BFDF cannot retain original legal mail even when contraband is detected. ECF No. 58 at 6. But Plaintiffs do not point to any case, and the Court is not aware of any, that would bar a detention facility from retaining mail that contains contraband and purports to be legal mail.

"The right to free speech is not absolute." Williams v. Town of Greenburgh, 535 F.3d 71, 77 (2d Cir. 2008). Nor is the attorney-client privilege "absolute." Matter of Grand Jury Subpoenas Served Upon Field, 408 F. Supp. 1169, 1172-73 (S.D.N.Y. 1976) (explaining that the

attorney-client privilege is subject to limitations). There are instances where the interest in promoting the free flow of communication between an attorney and client is outweighed by stronger public policy considerations. See, e.g., Ross v. UKI Ltd., No. 02-CV-9297 (WHP) (JCF), 2004 WL 67221, at *6 (S.D.N.Y. Jan. 15, 2004) (noting that no privilege applies to a client's communication of an "intent to commit a crime or perpetrate a fraud"); United States v. Greenberg, No. 21-CR-92 (AJN), 2022 WL 827304, at *9 (S.D.N.Y. Mar. 9, 2022) (noting that "the otherwise-inviolable attorney-client privilege gives way where the communications made between an attorney and her client were made for the purpose of getting advice for the commission of a fraud or crime") (internal quotation marks and citations omitted). Additionally, for security and investigative purposes, it is rational and reasonable for Defendants to retain mail entering the facility purporting to be legal mail but containing contraband. See, e.g., Duamutef v. Leonardo, 1993 WL 428509, at *2 (N.D.N.Y. Oct. 22, 1993), adopted by, 1994 WL 86700 (N.D.N.Y. Mar. 7, 1994) (upholding policy that infringed on Fourth Amendment privacy rights because the government has an "interest in preventing contraband from entering the prisons"); see also Prescott v. Chatham Cnty. Det. Ctr., 2023 WL 9065919, at *3 (S.D. Ga. Oct. 12, 2023), adopted by, 2024 WL 37215 (S.D. Ga. Jan. 3, 2024) (suggesting that non-legal mail could be retained in property bins).

Moreover, it seems implausible that a member of the bar would send confidential legal mail to a detainee soaked in contraband. Indeed, Assistant Field Office Director Harvey notes that BFDF's investigation in November 2023 revealed that contraband was entering the facility through "envelopes and papers in the mail" that were "*disguised* as legal mail and non-legal mail." ECF No. 46 at ¶ 8 (emphasis added). It thus would be reasonable to infer that mail containing contraband may not be properly categorized as legal mail, because it was not sent by

an attorney or their representative in furtherance of the attorney's representation of the detainee. And if the mail is non-legal, it is not afforded the same protections as legal mail. Davis, 320 F.3d at 351 ("Courts have consistently afforded greater protection to legal mail than to non-legal mail."); Smith v. City of New York, No. 14-CV443 (LTS) (KNF), 2015 WL 1433321, at *7 (S.D.N.Y. Mar. 30, 2015) (dismissing First Amendment claim premised on factual allegations that prisoner's non-legal mail was opened outside his presence); Prescott, 2023 WL 9065919, at *3 (explaining that inspection of non-legal mail "in the absence of allegations that [a policy] censored [non-legal mail] based upon its subject matter, does not allege a constitutional violation," and holding that complaint that challenged a mail policy whereby incoming mail was copied, and the originals were stored in detainees' property bins, would survive a motion to dismiss only if the policy applied to legal mail).

Given the deference afforded prison officials in administering "the day-to-day operation of a [prison] facility," Bell v. Wolfish, 441 U.S. 520, 547 (1979), the least intrusive injunction would return the parties to the status quo as it existed between May and November 2024.[10] I therefore respectfully recommend that the Court issue an injunction barring Defendants from opening legal mail outside of a detainee's presence and barring Defendants from retaining the original legal mail or a copy of that mail where no contraband is detected. Additionally, given BFDF's concern that contraband could enter the facility through documents received during court appearances, I further recommend that Defendants be permitted to extend the mail policy they had in place between May 2024 and November 2024 to legal mail received during court appearances, so long as any inspection or copying of that legal mail is done in the detainee's

[10] Although I recommend that Plaintiffs not be granted the mandatory injunction requested, for the reasons discussed herein, Plaintiffs have made a substantial showing of a likelihood of success on the merits, as required for the issuance of such an injunction.

presence and BFDF does not retain the original or a copy of the legal mail unless contraband is discovered.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiffs' motion for a preliminary injunction be **GRANTED** as modified herein.

**SO ORDERED.**

DATED: New York, New York
August 5, 2025

VALERIE FIGUEREDO
United States Magistrate Judge

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

**Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file any objections. See also Fed. R. Civ. P. 6(a), 6(b), 6(d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court. Any request for an extension of time to file objections or responses must be directed to the Honorable Gregory H. Woods. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a), 6(b), 6(d); Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).**